E-FILED; Baltimore County Circuit Court
Docket: 7/21/2026 8:24 PM; Submission: 7/21/2026 8:24 PM
Envelope: 27452746

Deficient per Rule 20-203(d). Unless corrected, not a valid pleading or paper

**IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND**

**SCOTT D. FRANCISCHETTI and**
**MARIE FRANCISCHETTI**
48 Yew Rd., Baltimore, MD 21221,

*Plaintiffs,*

v.

**UNISON AGREEMENT CORPORATION**
4 Embarcadero Center, Suite 710
San Francisco, CA 94111;

**UNISON MIDGARD HOLDINGS LLC**
4 Embarcadero Center, Suite 710
San Francisco, CA 94111;

**REAL ESTATE EQUITY EXCHANGE, INC., D/B/A UNISON**
4 Embarcadero Center, Suite 710
San Francisco, CA 94111; and

**UNISON INVESTMENT MANAGEMENT, LLC**
4 Embarcadero Center, Suite 710
San Francisco, CA 94111,

*Defendants.*

**SERVE:**
CSC-LAWYERS INCORPORATING SERVICE COMPANY
7 St. Paul Street, Suite 820
Baltimore, MD 21202
*(Maryland Registered Agent for Unison Agreement Corporation)*

CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
*(Delaware Registered Agent for Unison Midgard Holdings LLC, Real Estate Equity Exchange, Inc., and Unison Investment Management, LLC)*

**Case No.** C-03-CV-26-003382

**JURY TRIAL DEMANDED**

## Complaint

Plaintiffs, Scott D. Francischetti and Marie Francischetti, by counsel, file this complaint against Unison Agreement Corporation, Unison Midgard Holdings LLC, Real Estate Equity Exchange, Inc., and Unison Investment Management, LLC (together, "Unison"). In support of their complaint, Plaintiffs allege as follows:

## Introduction

**1.** Newlyweds Scott and Marie Francischetti bought their "forever home" at 48 Yew Road, Baltimore MD 21221 in July 2001. Like most Americans, the Francischetti family relied on their home. When the two raised their sons, they relied on their home to be a safe place to do it. When Scott and Marie became disabled, they relied on their home to accommodate their new needs. And when Scott and Marie ran into financial hardship in retirement, they relied on their home, their biggest financial asset, to provide the money to make ends meet. But Unison took the ability to rely on their home away from Scott and Marie Francischetti.

**2.** In 2019, Unison sold the Francischettis what it labeled an "option" in their single family suburban home. In substance, Unison made them a loan secured by the home, advancing them a fraction of its value in exchange. Deceived by Unison's false promises, the Francischettis signed onto a predatory agreement, granting Unison far greater interest rates, control over the property, and share in profits than a traditional mortgage. Years later, when Mr. and Mrs. Francischetti

attempted to end the agreement, they found Unison had taken their ability to do that away too, by refusing to tell them how much they owed on the loan or how that amount due was calculated.

**3.** The Francischettis chose Unison because of what it promised them. Branding itself as different from a traditional home loan, Unison told Scott and Marie Francischetti that they and Unison would be like partners, "investing alongside" one another in the home's equity. Unlike a regular loan, Unison claimed, a Unison Home Equity Investment (Unison's name for its loan product) would charge no interest and no monthly payments. Instead, Unison would merely take the increase in their share of the home's equity if it appreciated.

**4.** Those taglines disguised a far less favorable truth.

**5.** Unison's loans worked like mortgages, even though they had no license for mortgage lending. Unison's loans charged high interest rates, even though those rates were well above Maryland's legal usury limits. Unison's loan gave it more than its share of the equity value if the home appreciated and none of the costs if it didn't, even while Unison swore to homeowners the product was a partnership. And Unison's loan blocked off other ways homeowners could use their property as an asset, even though what it had promised was a chance to access a home's value more easily.

**6.** In 2026, the Francischettis realized how Unison's agreement had bound them. Despite great credit and the go-ahead from another mortgage lender, the Francischettis' application was rejected by Unison for violating the terms of the

loan agreement they had signed. Because of Unison, the Francischettis were blocked from accessing the value of a home now worth almost one and a half times what it had been when they first signed Unison's agreement.

**7.** The Francischettis tried to get out, and Unison stopped that too. In response to a payoff request, Unison sent a payoff statement seeking amounts unsupported by the agreement. Without accurate information about how to pay off Unison's loan, the Francischettis found themselves completely walled off from the value of the home they had spent their entire adult lives investing in.

**8.** Like most Americans their age, the Francischettis had planned for retirement by investing in real estate as their greatest asset. Unison's agreement locked that asset's value away without legal right to do so, siphoned it with heavy interest rates and unequal compensation, and ate up more than their share of the home's appreciation. In doing so, it violated the Maryland SAFE Act, Maryland Mortgage Lender Law, the Maryland Consumer Debt Collection Act, the Maryland Consumer Protection Act, Maryland Common Law on usury, and imposed unconscionable, unenforceable covenants and restraints that cloud their title to the property.

## Jurisdiction and Venue

**9.** The Court has subject-matter jurisdiction over Scott and Marie Francischetti's claims. "Circuit courts do not require expressed statutory authorization to entertain a particular type of civil action; instead, they have

jurisdiction over civil causes of action generally." *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.*, 382 Md. 689, 696 (2004).

**10.** The Court has personal jurisdiction over each Defendant. Each transacts business in Maryland: Unison made the Francischettis a loan secured by their Baltimore County home, recorded its covenants and deed of trust in the Baltimore County land records, and has serviced and enforced the agreement against them in Maryland ever since. *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3)–(5).

**11.** Venue is proper in Baltimore County. The property that secures Unison's loan is located in Baltimore County, Plaintiffs reside in Baltimore County, and no Defendant maintains a principal place of business in Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 6-201(a), 6-202(3).

**Parties**

**12.** Scott Francischetti is an individual resident of Baltimore County, Maryland.

**13.** Marie Francischetti is an individual resident of Baltimore County, Maryland.

**14.** Defendant Unison Agreement Corporation ("UAC") is a Delaware corporation with its principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, California. UAC has been registered to do business in Maryland since 2014 and is in good standing with the State Department of Assessments and Taxation (Dept. ID F15904469). UAC originated the Francischettis' loan, signed

their agreement, and took the deed of trust recorded against their home. UAC is a wholly owned subsidiary of Defendant Real Estate Equity Exchange, Inc.

**15.** Defendant Unison Midgard Holdings LLC ("Midgard") is a Delaware limited liability company with the same principal place of business. Midgard is a holding vehicle for the Unison Midgard Fund LP, an investment fund of roughly one billion dollars that buys Unison agreements for institutional investors. By an assignment recorded in the Baltimore County land records on December 30, 2019—five months after closing—UAC assigned the Francischettis' agreement to Midgard. Midgard holds the recorded interest in the Francischettis' home today. It is not registered to do business in Maryland.

**16.** Defendant Unison Investment Management, LLC ("UIM") is a Delaware limited liability company and an investment adviser registered with the U.S. Securities and Exchange Commission, with regulatory assets under management of more than $1.68 billion. UIM and its affiliates manage, and serve as general partners of, the funds—including the Midgard fund—that hold Unison agreements. UIM's personnel and systems handled Unison's 2026 communications with the Francischettis: the denial of their subordination request and the June 12, 2026 payoff demand each came from UIM's homepartners@unisonim.com address. UIM is a wholly owned subsidiary of Real Estate Equity Exchange, Inc. It is not registered to do business in Maryland.

**17.** Defendant Real Estate Equity Exchange, Inc. ("REX") is a Delaware corporation and the corporate parent of UAC and UIM. REX does business as

"Unison." It owns the Unison brand, establishes and maintains the unison.com website and the marketing materials at issue in this complaint, and developed the "proprietary investment decision engine" Unison uses to select the homes it pursues. REX is not registered to do business in Maryland.

**18.** Defendants operate as one enterprise under the "Unison" name. They share the same offices at 4 Embarcadero Center, Suite 710, San Francisco. On information and belief, they share common officers and management. They present themselves to consumers as a single company, "Unison." And in dealing with the Francischettis, each acted as the agent of the others: REX marketed the product, UAC originated and signed it, Midgard took and holds it, and UIM manages and enforces it.

**19.** This complaint refers to Defendants collectively as "Unison," and names the specific entity where the conduct belongs to one of them.

## Facts

<u>The Homeowners</u>

**20.** When Unison came to the Francischettis in 2019 with an offer to purchase an "option" in their home, its label for the loan it was selling, it did so because they were vulnerable.

**21.** Scott and Marie Francischetti are disabled.

**22.** Mr. Francischetti was permanently injured in a 2003 workplace accident which damaged his spine, leaving him lucky to be alive. As part of his continued treatment, he has had two extensive surgeries to fuse pieces of his spine together. While Mr. Francischetti is fortunate to be mobile, the injury was life-

altering. He struggles to walk due to numbness in his right leg, and lives with daily pain.

**23.** In 2023, Mr. Francischetti suffered a thoracic aortic aneurysm, a heart injury where the artery connecting the heart to the rest of the organs in the chest swells and threatens to rupture. To keep Mr. Francischetti safe, his cardiologist has limited his exertion, prohibiting Mr. Francischetti from basic day-to-day physical rigor like lifting more than 20 pounds at a time.

**24.** Mrs. Francischetti suffers from a heart condition known as cardiomyopathy. This condition restrains Mrs. Francischetti's ability to pump blood throughout her system, making her prone to fatigue, dizziness, and lightheadedness. She also lives with degenerative disc disease and has undergone two neck surgeries to mitigate the pain she lives with.

**25.** Because of their disabilities, the Francischettis live on a fixed income provided by social security and a worker's compensation payout. Investments like their home, and the ability to borrow against its value, are one of their few available sources of income in emergencies.

**26.** It is no coincidence Unison picked Scott and Marie Francischetti to offer their loan to. The homeowners Unison targets for these loans are vulnerable populations like the retired because their lack of employment income and inability to work full-time makes them more willing to sell or borrow against their home's equity—pushing them towards lenders like Unison. As a joint lawsuit between the American Association of Retired Persons (AARP) and National Association for

Consumer Advocates alleges, “the arrangement rarely, if ever, ends up ‘fair and square’ for the homeowner.”[1] Another lawsuit from Legal Counsel for the Elderly (LCE) and the AARP identifies that homeowners like the Francischettis who are “house-rich, cash-poor" are targeted by these programs because they are “particularly vulnerable to abusive and predatory schemes that dangle the prospect of quick cash.”[2]

**27.** Unison does not find these homeowners by chance. Unison’s executives say the company keeps a “10-year forecast on every house in America.” And in a brochure filed with the U.S. Securities and Exchange Commission, Unison’s investment-management affiliate describes a “proprietary investment decision engine” Unison uses to invest in agreements “on properties that it believes have a greater likelihood of appreciation.” On information and belief, Unison selected the Francischettis’ home the same way: not because the product fit the family’s finances, but because Unison’s models predicted the appreciation it planned to take.

<u>The Agreement</u>

**28.** In 2019, Unison offered the Francischettis its product: a loan similar to a reverse mortgage, which Unison labeled an “option.” Under the agreement, the Francischettis would exchange a portion of their home’s equity value for a one-time cash advance.

---

[1] *National Association of Consumer Advocates Inc. v. Unison Agreement Corporation, et al.* Docket No. 2026-CAB-000955, at 02/11/2026 (D.C. 2026).
[2] *Lily V. Evans v. Unison Agreement Corp., et al.* Docket No. 2026-CAB-000758, at 2/05/2026 (D.C. 2026) (removed to district court).

**29.** While figuring out how that home value would be calculated was difficult—the terms and conditions of the agreement were spread out over almost a hundred pages of documents, littered with jargon and only disclosing an actual formula on the final page—Unison's claims were simple. "As a true partner," Unison's website claimed, the Franciscchettis would "share both the upside and downside risk with the homeowner." A partnership with Unison, the Franciscchettis were told, would "enrich their lives." Trusting Unison, the two agreed.

> With our Unison HomeBuyer program, we partner with buyers, investing alongside them in their home, typically contributing half of the down payment. This gives buyers more purchasing power, reduces their monthly mortgage payment and allows them to retain cash. In return, we share in the change in value of the home at the time it is sold. As a true partner, we share both the upside and downside risk with the home owner. Our Unison HomeOwner Agreement program allows existing homeowners to tap into their home equity without interest or monthly payments.
>
> The focus of our company is on expanding opportunities available to consumers and giving them the financial flexibility to purchase the home they really want and finance important needs during their life as a homeowner. Unison is dedicated to providing consumers with financing based on partnership that will enrich their lives.

**Claim from Unison's Website, October 11, 2018**

**30.** Because Unison's agreement exchanged equity value for liquid value, the Franciscchettis received pennies on the dollar for the actual value of their home. Under the agreement, Scott and Marie Franciscchetti gave up an appreciating 44.44% share of the home's equity, worth $119,988.00, in exchange for a one-time $30,000.00 advance from Unison.

**31.** Despite what the Franciscchettis were promised, Unison's loan was no partnership.

**32.** Unlike a "true partner," Unison did not share losses equally.

**33.** Unlike a "true partner," Unison did not share profits equally.

**34.** Far from "enriching the lives" of the Francischettis, Unison's predatory agreement imposed greater costs than a loan, less lending security than a loan, and more restrictions than a traditional loan.

***Unison's Unlawful Interest Rates***

**35.** Unison brands its loans as different from loans because they impose "no interest." This is not the case.




**Claim from Unison's Website, October 18, 2018**

**36.** Interest is a fee charged by a lender for borrowing money. While Unison does not charge interest *monthly*, like a traditional loan, it nevertheless charges interest for its lending.

**37.** Once the Unison agreement terminates, Unison takes the value of its equity share in the home. Because Unison compensates well below the market value of its equity share—for example, providing the Francischettis $30,000.00 for $119,988.00 in home equity—when borrowers repay Unison at the end of their agreement, they always owe well over the principal Unison advanced.

**38.** Like monthly interest, the additional money due to Unison is designed to compensate them for the opportunity cost of lending.

**39.** But unlike traditional monthly interest, Unison's model for calculating its finance charges is willfully misleading and exorbitant.

**40.** Firstly, the interest due in a Unison agreement is obscured from the borrower. None of the information provided to homeowners indicates what the comparable interest rate might be.

**41.** Unison's actual interest rate is veiled by complex formula, dependent on the increase or decrease in value of the home, and Unison imposes no monthly due payment. Because what borrowers actually pay to borrow is unclear and abstract and the consumer gets no indication of that quantity from Unison until the agreement is due, there is little for a consumer to go on to understand how much their borrowing will cost them.

**42.** In the absence of tangible indications for the consumer on actual interest rate, Unison instead emphasizes blanket, misleading claims: that the product has "no interest," and that it's different from a "traditional loan."

> Unlike a loan, the Unison HomeOwner Agreement has no interest and no monthly payments, so you always have a better monthly cash flow compared to borrowing.

**Claim from Scott and Marie Francischetti's Disclosure agreement, July 2019**

**43.** Because Unison provides no individualized figure for what the consumer will pay to borrow—the only rate figures in the Francischettis' package were hypothetical examples for a $50,000 investment in a $500,000 home, printed on the ninth page of the disclosure stack—and instead leads with blanket claims that the product has no interest, consumers like the Francischettis are left with the impression that borrowing from Unison is less costly than traditional bank loans or mortgages.

**44.** This deception is all the more misleading because in practice, Unison charges a great deal more than other comparable lenders.

**45.** Unison's own 2019 disclosure put the cost of comparable borrowing at 3% to 6% for residential mortgage loans.

**46.** For a 2019 loan, Maryland law set an interest ceiling of 8% at most—and 6% absent a signed writing stating the rate. Md. Code Ann., Com. Law §§ 12-102, 12-103(a)(1).

**47.** Had the Francischettis paid off their Unison agreement in February of 2026 Unison would have brought due an amount equivalent to imposing a 21.162% interest rate for the loan's duration.

**48.** Unison knows how to state its price as an annual rate. On the ninth page of the disclosure stack the Francischettis signed, Unison's own "Total Unison

Cost Estimate" expresses the agreement's cost as an "Estimated Annualized Percentage Cost"—reaching 24.7% in Unison's own examples, more than triple Maryland's 8% ceiling. The front of the same package promised "no interest."

**49.** While calling its loans "no interest," Unison signs consumers onto a product that in practice may impose as much as double the Maryland legal limit on interest rates, all in one lump sum payment a consumer has no chance to calculate until the agreement is over. It did the very same to the Francischettis.

***Unison's False Marketing***

**50.** Unison makes its consumers a promise: that Unison and the homeowner will gain or lose together, equally.

**51.** This is not just false in practice; it is false by definition. Under the terms borrowers agree to, Unison always gains more than its interest if the property appreciates and loses no less than its initial share if the home depreciates.

**52.** When reviewing Unison's agreement, the Francischettis were assured of their "equal share in loss or gain" multiple times. Unison's website and contractual materials proudly assured its consumers that: "The profit or loss that Unison earns on its investment in your home will typically be equal to a specified percentage of the change in value of your home during the term."

> The profit or loss that Unison eams on its investment in your home will typically be equal to a specified percentage (the Investor Percentage) of the change in value of your home during the Term. A large profit for Unison typically means you will likewise have made a large profit on your home. Your Investor Percentage is stated in your Offer Package.

**Claim from Scott and Marie Francischetti's Disclosure agreement, July 2019**

**53.** Unison claimed, "when you win, we win. If the value of your home decreases, we will share a portion of the loss"




**Claim from Unison's Website, October 2018**

**54.** Unison claimed, "If your home has gone down in value, we both lose"

When you decide to sell your home:

IF YOUR HOME HAS GONE UP IN VALUE
We Both Win
We share in the appreciation.

IF YOUR HOME HAS GONE DOWN IN VALUE
We Both Lose
We share in the loss.[2]

**Claim from Unison's Website, October 2018**

**55.** Unison claimed, "This is not a home equity loan – this is a home ownership investment"




**Claim from Unison's Website, February 2019**

**56.** Unison's 2019 direct-mail advertising made the same promise in plainer words: "NO ADDED DEBT. By partnering with Unison you do not take on any additional debt." On information and belief, Unison sent materially identical solicitations to Maryland homeowners.

**57.** This assertion is false in two ways. First, Unison's claim that its "option" is a mere "share" that appreciates or depreciates with the home's equity value is false. Unlike a true investment, Unison's losses are capped.

**58.** Per its disclosures, "Unison cannot lose an amount greater than the Unison Investment Payment under the terms of the Unison HomeOwner Agreement."

**59.** In practice, Unison takes a share of the profits when the home appreciates. But Unison's recovery can never fall below the amount it advanced. Because of the unequal exchange at the outset of a Unison agreement (for example, the Francischettis provided Unison $119,988.00 in equity and Unison gave them $30,000 in cash) and the fact that Unison is always paid off in cash, not equity, Unison is always guaranteed to make back at a minimum the liquid value of its equity share less its payment to the buyers. In practice, this means Unison will receive tens of thousands in profit even when the home loses value. This is not a partnership or a share in losses. It is a loan on which Unison cannot lose.

**60.** The buy-out terms are worse still. In a Special Termination—the process by which a homeowner ends the agreement early, and the exit the Francischettis attempted—Unison bears no loss at all. The contract sets the Special Termination Price at the greater of the amount Unison advanced or that advance plus its full return on the home's appreciation. Unison's June 12, 2026 email to the Francischettis admitted it: "Unison does not share in change in value below the Original Agreed Value for special termination (buy-out)."

**61.** The agreement's first three years work the same way. If the home loses value and the agreement ends, the contract deems the ending value equal to the starting value, and the homeowner still repays Unison its advance in full. While promising "if your home has gone down in value, we both lose," Unison handed consumers a contract under which it never does.

**62.** Secondly, it is false to say that when a home appreciates in value, the amount Unison gains from the agreement is merely "a specified percentage of the change in value of your home during the term."

**63.** Instead, the amount Unison gains is, mathematically speaking, always of greater value than just their percentage of the change in equity value.

**64.** Regardless of whether a homeowner terminates, sells after the specified period, or dies, Unison's payout is calculated the same way: by taking the ending agreed value of the property times Unison's percentage of interest in it, minus the initial amount Unison compensated the homeowner for their share in the home.

**65.** Critically, whatever value this payout for Unison amounts to, it is ***mathematically a larger quantity*** than what Unison advertises it will take from a home's value after the agreement ends. Typically, the difference between Unison's advertised share of the payout and the actual share of the payout is thousands of dollars.

**66.** For the Francischettis, it would have meant a more than $10,000.00 difference between advertised and actual payout.

**67.** This distinction scales with the amount a borrower receives from Unison. The greater the compensation an individual receives, the less money they can make from the sale of their home.

***Unison's Unlicensed Lending***

**68.** While labeled an "option," Unison's product is a mortgage loan.

**69.** Like a mortgage, Unison's product places real estate, specifically the homeowner's property, as collateral for repayment of a loan. Nothing about Unison's labels changes that the product it sells functions as a mortgage in the most basic sense.

**70.** The loan Unison sold to Scott and Marie Francischetti was no different. Their "option" provided them with a loan and to secure repayment listed their home as collateral.

**71.** The state of Maryland requires sellers of mortgages to be licensed. When Unison made the Francischettis their loan, which was a mortgage, it was unlicensed to do so.

**72.** Because Unison lent unlicensed to Scott and Marie Francischetti, the two were not protected by the ordinary guarantees of credibility, competence, and good faith Maryland law imposes on mortgage lenders.

**73.** Scott and Marie Francischetti had no assurance their Unison representative was of good moral character, that he had experience in the field of property lending, or a lack of relevant criminal history. They had no promise the Maryland Commissioner would examine Unison for compliance with Maryland mortgage lending guidelines. Most importantly, they had no guarantee that Unison could not act in bad faith or dishonesty without losing their ability to lend.

**74.** Had Unison been subject to that guarantee that they operated their business honestly, fairly, equitably and efficiently, they would not have been able to make Scott and Marie Francischetti the loan against the 48 Yew Road, Baltimore

MD 21221 property because of the misleading representations and high interest rates discussed above.

***Unison's Property Restrictions***

**75.** Beyond siphoning equity value from Mr. and Mrs. Francischetti's home, the Unison agreement took away their control over it.

**76.** As part of the loan, Unison imposed a covenant on the 48 Yew Road property, limiting how the Francischettis could live in, renovate, or borrow against their home.

**77.** Unison's Covenant agreement required the Francischettis to:

**a.** Keep the home as their primary residence;

**b.** Refrain from using their home for any non-residential purpose, which Unison defined as including AirBnB rentals; and

**c.** Limit the amount of debt they took out to non-Unison third parties secured by a lien on the property.

**78.** The restrictions these covenants put in place prevented the Francischettis from using their home as an asset. If the two wanted to save money by moving into a smaller home and renting out the 48 Yew Road property, Unison's covenant would stop them. If they had wanted to use their adult sons' now-vacant former bedrooms as apartments or AirBnB rentals, Unison's covenant would stop them. And if the two wanted to go to any other lender, Unison would stop them if their home's total debt was greater than $162,000.00.

**79.** On information and belief, Unison sets its covenanted debt cap deliberately low in order to prevent homeowners from accessing non-Unison borrowing alternatives.

**80.** Experts recommend borrowing against no more than 80% of a home's total equity. For the Francischettis, Unison's debt cap put them at a ceiling of borrowing against just shy of 60% of their total equity, well below that boundary. Unison imposes this arbitrarily low ceiling not to ensure repayment, but to make it so homeowners cannot access non-Unison sources of equity capital.

**81.** The restrictions have one purpose: making sure Unison collects its return. The covenants work as loan covenants. The occupancy requirement preserves the collateral that secures repayment. The debt cap keeps the home's equity free to satisfy Unison's claim ahead of anyone else's. And the rental prohibition protects the resale value from which Unison takes its charges. These are the marks of a secured lender protecting its interest, not a partner sharing an investment.

**82.** The covenants confirm the transaction's substance under Maryland law. Unison advanced money, expected repayment with a return, and secured both against the Francischettis' home with a recorded deed of trust. Maryland treats as interest any compensation a lender takes, directly or indirectly, for extending credit. Md. Code Ann., Com. Law § 12-101(e). The covenants exist so Unison collects that interest.

**83.** The last roadblock was one the Francischettis were confronted with firsthand. In February of 2026, Mr. and Ms. Francischetti applied for a conventional second mortgage on their home.

**84.** The mortgage lender noted Scott and Marie Francischetti had unblemished, excellent credit, a home in good condition that had appreciated almost $150,000.00 since they'd bought it, and a steady source of income.

**85.** The two were conditionally approved.

**86.** But Unison blocked the loan. The credit union's approval carried one condition that mattered: Unison had to subordinate its lien, as its own covenant contemplates. Unison declined the subordination request. With Unison's lien stuck in place the loan could not close, and in February 2026 the credit union closed the application because, in its own words, it could not "subordinate or payoff the Unison agreement."

**87.** The credit union's file shows what Unison's advertising denied. It carried Unison's "option" as a $30,000 mortgage on the home—the added debt Unison promised its product would never create, now blocking the Francischettis from borrowing against their own house.

**88.** These covenants close off other sources of income for Unison's borrowers. The result, in practice, is that once homeowners have sold their home's equity to Unison, it becomes increasingly difficult for them to not come back to sell more. Even if homeowners realize Unison's product misled them, shortchanged them, or imposed unlawful interest, once they have signed Unison's agreement they

have few other avenues left. By stonewalling a homeowner's ability to borrow from better lenders and outright prohibiting them from using the home as an asset, Unison's covenants make Unison's lending the only real choice left.

**89.** Unison took a $119,988.00 portion of the Francischettis' home equity. It took a guaranteed profitable share of their home's value as it appreciated over the next seven years. It even took the Francischettis' ownership of that home away, kneecapping their ability to use it as an asset through restrictive covenant. In exchange? The Francischettis received $30,000.00, less the $1,170.00 transaction fee Unison deducted at closing.

<u>Unison's Debt Collection</u>

**90.** After Unison's refusal to subordinate cost them the second mortgage in February of 2026, the Francischettis tried to pay off Unison's loan and exit their agreement.

**91.** After multiple attempts to contact Unison, the Defendant replied to Mr. and Mrs. Francischettis' inquiries on June 12, 2026, with an email detailing what they would have to pay to end the agreement.

**92.** The information provided within that email, contained within a chart labeled "Unison Option Math Calculation," was inaccurate, inflated, and willfully misleading to dissuade the Francischettis from exiting their agreement.

**93.** Specifically, the June 12th, 2026 email contained the following errors, all unexplained:

**a.** A misstatement of the percentage in equity Unison owned in the home as 44% instead of 44.44%;

**b.** A claim the Francischettis had been paid almost double the amount Unison had actually compensated them, listing the original Unison payout as $55,125.00 instead of $30,000.00;

**c.** A new value called the "Unison Option Price," undefined in any correspondence or contracts between Unison and the Francischettis, which figured into the calculation of the quantity Unison was to receive from the Francischettis.

**d.** A value labeled "Your Estimated Payoff," presumably the total amount the Francischettis needed to pay to exit the agreement, that was calculated incorrectly, even as a product of the incorrect numbers Unison provided above.

**94.** Misrepresentations like these make it challenging, if not impossible, for homeowners to exit Unison's agreement. Without accurate numbers on what they would need to pay off, reliable or consistently used formulas on how those numbers are calculated, and credible communication from Unison about basic variables like the principal Unison advanced, homeowners like Mr. and Mrs. Francischetti cannot pay Unison out.

**95.** Unison's June 12, 2026 email was particularly insidious. Because the value listed as what the Francischettis had originally received was identical to the value described as their "estimated payoff," it created the impression for an

unsuspecting reader that if the Franciscchettis simply paid Unison the "estimated payoff" value, they would be out of the agreement and only be breaking even.

The Franciscchettis' Discovery of Unison's Conduct

**96.** The Franciscchettis did not know, and could not reasonably have known, what Unison had sold them until 2026. Unison told them its product was not a loan, carried no interest, and added no debt. No document Unison gave them stated an interest rate or the amount they would one day owe. The only pricing formula sat on the final page of a nearly hundred-page stack, and the only rate figures were hypotheticals built on someone else's numbers.

**97.** Nothing during the agreement's life put them on notice. Unison charged nothing monthly, sent no statements, and disclosed no accruing amounts. Its charges accumulated silently, by design.

**98.** The Franciscchettis first learned what Unison had sold them in February 2026. Unison refused to subordinate, and their credit union's file carried Unison's "option" as a $30,000.00 mortgage blocking their loan. Unison's June 12, 2026 payoff demand then revealed the inflated and unexplained amounts Unison claims. Only then could the Franciscchettis have discovered that the product was a loan carrying charges Maryland law forbids.

**99.** Each claim pleaded here accrued no earlier than February 2026, when the Franciscchettis first knew or reasonably should have known of the wrong. Because Unison's own misrepresentations kept knowledge of these claims from

them, limitations also did not begin to run until the Francischettis discovered the fraud.

**100.** Unison's conduct also continues. Unison keeps its covenants and lien on record, still refuses subordination, and still demands amounts its own agreement does not support. Each new demand and each month of enforcement inflicts fresh injury.

Damages

**101.** Scott and Marie Francischetti planned for retirement responsibly. Their home was more than just a place to live, it was an investment in their future. Despite unexpected life-altering disabilities and a resulting forced retirement, the home gave Scott and Marie a financial resource to count on to weather those hardships. Unison took that sound investment, and all it could be counted on to bring them, away with one signature.

**102.** The financial cost of Unison's misconduct on the Francischettis was tremendous. Without the ability to borrow against their home, the Francischettis were unable to adjust to financial emergencies that arose in the way they had planned to do. They were forced to borrow from friends and family, forego renovations to accommodate their disabilities, and even begin gig-based labor for DoorDash to make ends meet—all while sitting on an asset estimated at $400,000.00 they could not use.

**103.** But Unison's misconduct did more than just undermine the Francischettis' financial health. It also took a toll on the two emotionally. Scott and

Marie Francischetti spent many sleepless nights worrying about what their debt to Unison meant for their future. Scott even was put on a prescription of Klonopin to prevent his daily anxiety from posing a risk to his health in light of his heart condition.

**104.** In addition, the work Scott and Marie had to take on—DoorDash driving and delivery—was disastrous for their physical health. Mr. Francischetti's doctor noted a downturn in his physical health and mobility following the DoorDash labor. Mrs. Francischetti recalls experiencing going into AFIB—a heart arrhythmia—out of concern for Scott who sometimes had to exert himself against his doctor's recommendations to deliver food orders. Not only has Unison's loan taken a substantial sum of Scott and Marie Francischetti's financial safety net, it has turned their retirement years into a time of fear and stress, and put their health at great risk.

## Count One: SAFE Act

**105.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**106.** § 13-604 of the Maryland SAFE Act provides that "[a] susceptible adult or older adult who has been subjected to financial exploitation in the State...may bring a cause of action against a person who has committed financial exploitation against the susceptible adult...to recover damages and obtain other appropriate relief as set forth under this subtitle." Md. Code Ann., Est. & Trusts § 13-604.

### Eligibility for SAFE Act Coverage

**107.** Scott and Marie Francischetti are both susceptible adults under the elevated protection § 13-604 provides.

**108.** § 13-601(k) of the SAFE Act defines "susceptible adult" as an adult who "is unable to perform, without prompting or assistance, one or more activities of daily living, is unable to protect the adult's rights, or has diminished executive functioning," due to, among other conditions, impaired mobility, or mental, emotional, sensory, or physical disability or disease. Md. Code Ann., Est. & Trusts § 13-601(k).

**109.** Scott and Marie Francischetti have difficulty performing the basic activities of daily living due to physical disability and impaired mobility under § 13-601(k)(2) and (3). *See Id*. at § 13-601(k)(2)-(3).

**110.** The above-described disabilities have changed the way Scott and Marie live their lives day-to-day. Ordinary household tasks like housekeeping, running errands, or bathing take extra time and effort. Their home is accessibly constructed in order to meet these needs, including a handicapped bathroom with an accessible shower and bidet.

**111.** Mr. Francischetti cannot bathe or complete ordinary household tasks without assistance or accommodation. His spinal injuries leave him unable to walk without difficulty, his cardiologist prohibits him from lifting more than twenty pounds, and he can no longer perform housework. Mrs. Francischetti's cardiomyopathy and degenerative disc disease leave her prone to fatigue, dizziness, and lightheadedness that require prompting and assistance with errands,

housekeeping, and transportation. Each is unable to perform one or more activities of daily living without prompting or assistance, and each has difficulty protecting their own rights in financial transactions. *See* Md. Code Ann., Est. & Trusts § 13-601(k)(2)-(3).

**112.** Both Mr. and Mrs. Francischetti qualify for and receive Social Security disability benefits as their primary income source.

SAFE Act Violations

**113.** Unison's sale of its loan to Scott and Marie Francischetti, two susceptible adults, was unlawful financial exploitation.

**114.** The SAFE Act took effect October 1, 2021, and applies to Unison's conduct from that date forward. Plaintiffs' claim rests on Unison's post-enactment acts: its enforcement of the covenants to block Plaintiffs' February 2026 loan, its refusal to subordinate, and its June 12, 2026 payoff demand seeking amounts the agreement does not support. Unison's 2019 representations supply the context that makes that later conduct exploitative.

**115.** § 13-601(e)(1)(ii) defines financial exploitation as an act taken by an individual or entity who, "[b]y deception, false pretenses, false promises, larceny, embezzlement, misapplication, conversion, intimidation, coercion, isolation, excessive persuasion, or similar actions and tactics, obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the

benefit of someone other than the susceptible adult or older adult." *Id.* § 13-601(e)(1)(ii).

**116.** Unison falsely advertising its loans as having "no interest" was deception, false pretenses, and false promises with the intent to deprive a susceptible adult of funds as prohibited by § 13-601(e)(1)(ii).

**117.** Unison falsely claiming it and its borrowers would gain and lose together, equally, was deception, false pretenses, and false promises with the intent to deprive a susceptible adult of funds as prohibited by § 13-601(e)(1)(ii).

**118.** Unison's unlicensed mortgage lending was done under false pretenses with the intent to deprive a susceptible adult of funds as prohibited by § 13-601(e)(1)(ii).

**119.** Unison's post-2021 enforcement of covenants it knew were unenforceable—including its February 2026 refusal to subordinate—was deception, false pretenses, or tactics similar thereto, and an endeavor to obtain or use a susceptible adult's property with the intent to deprive them of its use and benefit, as prohibited by § 13-601(e)(1)(ii).

**120.** Unison's email to the Franciscchettis containing inaccurate and overestimated payoff amounts to exit the agreement was deception, false pretenses, and false promises with the intent to deprive a susceptible adult of funds as prohibited by § 13-601(e)(1)(ii).

**121.** As a result of Unison's misconduct, Scott and Marie Franciscchetti suffered compensatory damages, including attorneys' fees, and emotional distress.

As a result of Unison's misconduct, Scott and Marie Francischetti suffered damages, including economic loss and emotional distress. For Count One, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Award compensatory damages, including for emotional distress, under Md. Code Ann., Est. & Trusts § 13-606(a);

B. Award an amount up to three times the compensatory damages, plus prejudgment interest, under § 13-606(b);

C. Award attorneys' fees and expenses under § 13-606(d);

D. Order rescission and other equitable relief under § 13-606(c)(i).

**<u>Count Two: Maryland Consumer Protection Act</u>**

**122.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**123.** The Maryland Consumer Protection Act prohibits, among other conduct, the following unfair or deceptive acts and practices:

1) Making a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" Md. Code. Ann., Com. Law § 13-301(1)

2) Representing that "[c]onsumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not" *Id*. § 13-301(2)(iv)

3) "Fail[ing] to state a material fact if the failure deceives or tends to deceive" *Id.* § 13-301(3)

4) "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with…the promotion or sale of any consumer goods, consumer realty, or consumer service" *Id.* § 13-301(9)(i)

**124.** Unison's false or misleading claims to the Francischettis about their agreement's terms and mechanics violated the above-listed provisions of the Maryland Consumer Protection Act.

**125.** Unison's conduct goes beyond violating the above-listed enumerated prohibited practices in violation of the Maryland Consumer Protection Act. *See In re SmartEnergy Holdings, LLC*, 486 Md. 502, 518 (2024) (Noting Md. Code. Ann., Com. Law § 13-301 "contains a nonexclusive list of such [unfair, abusive, or deceptive] practices").

**126.** Unison's sale of its loan agreement to Scott and Marie Francischetti was unfair in the following ways:

1) The agreement was designed to guarantee Unison a profit regardless of how the home appreciated or depreciated; and

2) The agreement was designed to guarantee Unison would always make more than its share in appreciation, contrary to what consumers were advertised;

**127.** Unison's sale of its loan agreement to Scott and Marie Francischetti was deceptive in the following ways:

1) The loan was falsely advertised as having no interest;
2) The loan was falsely advertised as creating no new debt;
3) The loan was falsely advertised as not being a loan; and
4) The loan was falsely advertised as operating as a partnership, entailing an equal share of losses and profits based on equity ownership for the homeowner and Unison;

**128.** Unison's sale of its loan agreement to Scott and Marie Francischetti was unfair or abusive in the following ways:

1) The covenants the agreement imposed on Scott and Marie Francischetti unlawfully regulated their conduct, not the home's;
2) The covenants the agreement imposed on Scott and Marie Francischetti's home unlawfully posed an impermissible restraint on alienation;
3) The making of the loan, a mortgage, was done without the requisite license; and
4) The functional interest rates under Unison's loan were above the Maryland ceiling;

**129.** As a result of Unison's misconduct, Scott and Marie Francischetti suffered compensatory damages, including attorneys' fees, and emotional distress.

**130.** The Franciscchettis received Unison's representations directly. Unison's representative made them by phone and in person at their home in 2019, and the written offer and disclosure package they signed repeated them: "no interest," a product that is "not a loan," and a partner whose "profit or loss . . . will typically be equal to a specified percentage of the change in value of your home." The Franciscchettis relied on those representations in granting Unison an interest in their home; had they known the product's real cost and terms, they would not have signed.

**131.** The sale of Unison's product and its accompanying services was a sale of consumer realty and consumer services under Md. Code Ann., Com. Law § 13-303.

**132.** That reliance caused objectively identifiable losses: a transaction fee of approximately $1,170.00 deducted from the Franciscchettis' payment at closing, the loss of the $65,000.00 home-equity loan that Unison's covenants and refusal to subordinate blocked in February 2026, the costlier borrowing and gig work they turned to instead, and the equity Unison claims and has locked away.

As a result of Unison's misconduct, Scott and Marie Franciscchetti suffered actual injury and loss, including economic loss and emotional distress, recoverable under Com. Law § 13-408(a). For Count Two, Plaintiffs Scott and Marie Franciscchetti respectfully request this Court:

A. Award compensatory damages, including for emotional distress and mental anguish;

B. Award attorneys' fees and costs under Com. Law § 13-408(b);

## Count Three: Maryland Consumer Debt Collection Act

**133.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**134.** The Maryland Consumer Debt Collection Act prohibits, among other conduct, the following acts and practices in debt collection:

A. Claiming "a right with knowledge that it doesn't exist" Md. Code Ann., Com. Law § 14-202(8);

B. Making false representations about the "legal status of any debt," either by making a "false representation of the character, amount, or legal status of any debt" or by "the use of any false representation or deceptive means" to collect a debt. *Id.* § 14-202(11), incorporating 15 U.S.C. §§ 1692e(2)(A), 1692e(10); and

C. Collecting amounts neither "expressly authorized by the agreement creating the debt" nor "permitted by law." Md. Code Ann., Com. Law § 14-202(11), incorporating 15 U.S.C. § 1692f(1).

**135.** Unison's June 12, 2026 email concerning the Francischetti payout violated all three of the above debt collection provisions. In providing an inaccurate amount due to Mr. and Mrs. Francischetti, Unison claimed a right to payment with knowledge it did not exist. In giving wrong information about the amount of money borrowed, the manner in which payout was calculated, and the amount due, Unison made a false representation about the legal status of a debt. And attempting to

collect a principal amount the Francischettis had never borrowed, Unison attempted to collect charges not expressly permitted by law.

**136.** The June 12, 2026 email was a collection communication: Unison sent it in response to the Francischettis' request to pay off and terminate the agreement, and it stated the amounts Unison claimed due under the agreement and the recorded deed of trust as the price of their exit.

**137.** Unison acted with actual knowledge that the claimed right did not exist, or with reckless disregard as to its falsity. Unison wrote the agreement; its own Exhibit A states the $30,000.00 payment, the 44.44% Investor Percentage, and the $89,988.00 Unison Purchase Price Balance. Its email nevertheless reported the payment as $55,125.00, the percentage as 44%, and a "Unison Option Price" of $284,200.00 that matches no figure in the agreement. Its "Estimated Payoff" does not follow even the email's own stated formula. *See Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 563–69 (2021).

**138.** As a result of Unison's misconduct, Scott and Marie Francischetti suffered damages, including emotional distress and mental anguish, recoverable under Md. Code Ann., Com. Law § 14-203. For Count Three, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Award compensatory damages, including for emotional distress and mental anguish;

B. Award attorneys' fees and costs as a parallel claim of the Consumer Protection Act violation via Com. Law § 13-301(14)(iii) and § 13-408(b);

C. Enter a declaration that Unison's payoff demands are unlawful.

**Count Four: Usury**

**139.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**140.** Under Maryland Law, "a lender may charge interest at an effective rate of simple interest not in excess of 8 percent per year on the unpaid principal balance of a loan if there is a written agreement signed by the borrower which sets forth the stated rate of interest charged by the lender." Md. Com. Law § 12-103(a)(1).

**141.** The 2019 agreement is governed by the usury rules in force when it was made. Because Unison's writings say the product carries "no interest," no signed writing states a rate, and the 6% ceiling of Md. Com. Law § 12-102 applies; at most, § 12-103(a)(1) allows 8%. Maryland measures interest by substance, not labels: "interest" is any compensation "directly or indirectly" imposed for the extension of credit, Md. Com. Law § 12-101(e), and courts look through a transaction's form to its substance. *Nationstar Mortgage LLC v. Kemp*, 476 Md. 149, 159–61 (2021).

**142.** Unison has collected charges on the loan: it deducted a transaction fee of approximately $1,170.00 from the payment due to the Francischettis at closing, and its June 12, 2026 demand seeks unlawful interest as the price of terminating the agreement.

**143.** As discussed above, Unison imposes an effective interest rate of 21.162%—more than double the 8% ceiling of Md. Com. Law § 12-103(a)(1) and more than triple the 6% rate of § 12-102.

For Count Four, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Enter a forfeiture of all unlawful interest and charges;

B. Award Plaintiff the greater of three times the excess interest and charges collected or $500.00, per Com. Law § 12-114.

**Count Five: Unlicensed Mortgage Lending**

**144.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**145.** Under Maryland Law, a person may not act as a mortgage lender unless they hold a mortgage license. Md. Fin. Inst. § 11-504.

**146.** The license requirement reaches any person who makes a mortgage loan. UAC made this loan.

**147.** The agreement was a mortgage loan under the Mortgage Lender Law as that law stood in 2019: an advance of money secured by a deed of trust on the Francischettis' dwelling.

**148.** Unison held no mortgage license at the time it made its loan to the Francischettis.

**149.** In making its loan to Scott and Marie Francischetti while unlicensed as a mortgage lender, and without any statutory exemption, UAC violated Md. Fin. Inst. § 11-504.

For Count Five, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Declare that Defendants may collect only the principal amount of the loan and may not collect any interest, costs, finder's fees, broker fees, or other charges, per Md. Code Ann., Fin. Inst. § 11-523(b);

B. Order Defendants to credit or disgorge every amount collected beyond principal.

## <u>Count Six: Unenforceable Restraint on Alienation</u>

**150.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**151.** In Maryland, covenants are limited in their ability to restrain alienation. "A restraint on alienation ... is an attempt by an otherwise effective conveyance or contract to cause a later conveyance

a. to be void [ (a disabling restraint) ]; or

b. to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey [ (a promissory restraint) ]; or

c. to terminate or subject to termination all or a part of the property interest conveyed [ (a forfeiture restraint)]." *R.H. Macy & Co., Inc., et al. v. the May Department Stores Company, et al.* 337 Md. 323, 330 (1995), quoting Restatement (First) of Property Section 404 (1944).

**152.** Unison has styled their debt cap covenant as a disabling restraint in using it as a method of prohibiting later transactions, like the Francischettis' attempts to refinance their mortgage, from occurring. While other legal instruments, such as a contract, may create enforceable debt caps, Unison may not do so via covenant.

**153.** Unison's requirement the homeowners occupy their property as a "principal residence" is a promissory restraint, because under the terms of the Unison Homeowner Covenant Agreement it makes the homeowner subject to a default in their loan agreement.

**154.** Unison's requirement that homeowners not rent the property, even in a residential capacity (such as an AirBnB) is a forfeiture restraint, because it terminates a homeowner's property right to rent out their property.

**155.** A disabling restraint is per se unenforceable. *Id.* at 330, quoting *Meade v. Dennistone*, 173 Md. 295, 305-06 (1938).

**156.** "[A] restraint on the alienation of a legal possessory estate in fee simple which is, or but for the restraint would be, indefeasible is valid if, and only if,

1) the restraint is a promissory restraint or a forfeiture restraint, and

2) the restraint is qualified so as to permit alienation to some though not all possible alienees, and

3) the restraint is reasonable under the circumstances...." *R.H. Macy & Co., Inc., et al. v. the May Department Stores Company, et al.* 337 Md. 323, 331 (1995), quoting Restatement (First) of Property Section 406 (1944).

**157.** Unison's "principal residence" covenant is unenforceable because the restraint is unqualified—it permits no alienation of the property by homeowners, regardless of whom the property would be alienated to.

**158.** Unison's prohibition on rentals is unenforceable because it is unreasonable under all the circumstances. "The following factors, when found to be present, tend to support the conclusion that the restraint is unreasonable:

1) the restraint is capricious;

2) the restraint is imposed for spite or malice;

3) the one imposing the restraint has no interest in land that is benefited by the enforcement of the restraint;

4) the restraint is unlimited in duration;

5) the number of persons to whom alienation is prohibited is large...." *R.H. Macy & Co., Inc., et al. v. the May Department*

*Stores Company, et al.* 337 Md. 323, 332 (1995), quoting Restatement (First) of Property Section 406 (1944).

**159.** Here, Unison's prohibition on the Francischettis using their property as a residential rental is capricious and malicious, because it serves no purpose in protecting Unison's property right in the area. Further, Unison's restraint is unlimited in duration, and prohibits alienation to all potential consumers who may want to use the property. For these reasons, the restraint on alienation imposed by the covenant is unenforceable.

**160.** The Francischettis are in actual, peaceable possession of the property. Unison's recorded covenants and deed of trust are a hostile claim against their title. No other action is pending that tests the validity of that claim. Md. Code Ann., Real Prop. § 14-108(a).

For Count Six, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Enter a declaratory judgment that the covenants are unenforceable restraints on alienation;

B. Enter an order removing the covenants and Unison's lien from the land records and quieting title under Md. Code Real Prop. § 14-108;

C. Award damages for blocking access to the Francischettis' home equity.

## **Count Seven: Quiet Title**

**161.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**162.** Scott and Marie Francischetti hold record title to the 48 Yew Road property and are in actual, peaceable possession of it.

**163.** Unison claims hostile interests of record against that title: the deed of trust UAC recorded in 2019, the covenants recorded with it, and the assignment to Midgard recorded December 30, 2019. Each is a cloud on the Francischettis' title.

**164.** The recorded instruments secure a loan Maryland law makes unenforceable: made without a license, carrying interest above the legal ceiling, and procured by the deceptive practices described above. An unenforceable loan supports no valid lien.

**165.** No other action is pending to enforce or test the validity of Unison's claimed lien, covenants, or other adverse claims. Md. Code Ann., Real Prop. § 14-108(a).

For Count Seven, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Quiet title to the 48 Yew Road property in Plaintiffs, free of Unison's deed of trust, covenants, and any other claimed interest, under Md. Code Ann., Real Prop. §§ 14-108 and 14-601 through 14-621;

B. Declare the deed of trust, the recorded covenants, and the recorded assignment void, and order them released from the Baltimore County land records;

C. Award costs.

**Count Eight: Unconscionability**

**166.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

**167.** Maryland courts refuse to enforce unconscionable contracts. A contract is unconscionable where one party lacked meaningful choice and the terms unreasonably favor the other party. *See Walther v. Sovereign Bank*, 386 Md. 412, 426 (2005).

**168.** The Francischettis had no meaningful choice. Unison presented a take-it-or-leave-it form spread across nearly one hundred pages of jargon. It buried the only pricing formula on the final page and stated no interest rate anywhere. And it marketed the product to two disabled homeowners on fixed income as a no-interest partnership. The bargain was procedurally unconscionable.

**169.** The terms unreasonably favor Unison. They impose an effective interest rate of 21.162%, more than double Maryland's ceiling. They guarantee Unison cannot lose while promising that both sides share losses. They took an appreciating $119,988.00 equity share in exchange for $30,000.00. And they restrain how the Francischettis may live in, rent, and borrow against their own home. The terms are substantively unconscionable.

**170.** The Court may decline to enforce the agreement, the covenants, and the deed of trust, and may declare the parties' rights and the instruments'

invalidity under the Maryland Uniform Declaratory Judgments Act. Md. Code Ann., Cts. & Jud. Proc. §§ 3-406, 3-409.

For Count Eight, Plaintiffs Scott and Marie Francischetti respectfully request this Court:

A. Declare the Unison agreement, its covenants, and the deed of trust unconscionable and unenforceable;

B. Rescind the agreement and cancel the covenants and lien of record on terms the Court finds equitable, crediting the amounts Unison advanced against the amounts it has collected and withheld;

C. Award such other and further relief as justice requires.

**171.** Under Maryland Rule 2-305, Plaintiffs state that the amount of damages sought exceeds $75,000.00.

**Notice of Claim for Attorneys' Fees Allowed By Law**

**172.** Pursuant to Rule 2-703(b), Plaintiffs include this claim for attorney's fees in this initial pleading, and advise the court and the Defendants that they believe this case is likely to result in a substantial claim for attorneys' fees under Md. Code Ann., Com. Law § 13-408(b) for services over a significant period of time.

Date: July 21, 2026

Respectfully submitted,

By: */s/ Angel E. Reyes*
Angel E. Reyes
CPF# 2507211007
POWER TO THE PEOPLE LAW PLLC
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Angel@powertothepeoplelaw.com

**Jury Demand**

Plaintiffs request a jury trial on all issues so triable.

*/s/ Angel E. Reyes*
Angel E. Reyes

E-FILED; Baltimore County Circuit Court
Docket: 7/21/2026 8:24 PM; Submission: 7/21/2026 8:24 PM
Envelope: 27452746

IN THE CIRCUIT COURT FOR Baltimore County (CC)
City/County

## CIVIL – NON-DOMESTIC CASE INFORMATION REPORT C-03-CV-26-003382

**DIRECTIONS**

***Plaintiff:*** This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).
***Defendant:*** You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

**FORM FILED BY:** ☒ PLAINTIFF ☐ DEFENDANT CASE NUMBER ______ (Clerk to insert)

**CASE NAME:** Scott D. Franciscbetti, et al. (Plaintiff) vs. Unison Agreement Corporation, et al. (Defendant)

PARTY'S NAME: Scott Franciscbetti and Marie Franciscbetti PHONE: (443)928-0456

PARTY'S ADDRESS: 48 Yew Rd., Baltimore MD 21221

PARTY'S E-MAIL: sf49ers08@msn.com, marieelena812@msn.com

**If represented by an attorney:**

PARTY'S ATTORNEY'S NAME: Angel Reyes PHONE: (202)952-3200

PARTY'S ATTORNEY'S ADDRESS: 1601 Connecticut Ave NW, Suite 800

PARTY'S ATTORNEY'S E-MAIL: angel@powertothepeoplelaw.com

**JURY DEMAND?** ☒ Yes ☐ No

**RELATED CASE PENDING?** ☐ Yes ☒ No If yes, Case #(s), if known: ______

**ANTICIPATED LENGTH OF TRIAL?:** ______ hours 3 ______ days

**PLEADING TYPE**

**New Case:** ☒ Original ☐ Administrative Appeal ☐ Appeal

**Existing Case:** ☐ Post-Judgment ☐ Amendment

***If filing in an existing case,*** skip Case Category/Subcategory section – go to Relief section.

**IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.)***

**TORTS**
☐ Asbestos
☐ Assault and Battery
☐ Business and Commercial
☐ Child Victims Act
☐ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☐ Fraud
☐ Lead Paint – DOB of Youngest Plt: ______
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☒ Misrepresentation
☐ Motor Tort
☐ Negligence
☐ Nuisance
☐ Premises Liability
☐ Product Liability
☐ Specific Performance
☐ Toxic Tort
☐ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud
☐ Government
☐ Insurance
☐ Product Liability

**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
  ☐ Commercial
  ☐ Residential
  ☐ Currency or Vehicle
  ☐ Deed of Trust
  ☐ Land Installments
  ☐ Lien
  ☐ Mortgage
  ☐ Right of Redemption
  ☐ Statement Condo
☐ Forfeiture of Property/ Personal Item
☐ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☐ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance
☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. – Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☐ Equitable Relief
☐ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

- ☐ Abatement
- ☐ Administrative Action
- ☐ Appointment of Receiver
- ☐ Arbitration
- ☐ Asset Determination
- ☐ Attachment b/f Judgment
- ☐ Cease & Desist Order
- ☐ Condemn Bldg
- ☐ Contempt
- ☒ Court Costs/Fees
- ☒ Damages-Compensatory
- ☐ Damages-Punitive
- ☐ Earnings Withholding
- ☐ Enrollment
- ☐ Expungement
- ☐ Financial Exploitation
- ☐ Findings of Fact
- ☐ Foreclosure
- ☐ Injunction
- ☐ Judgment-Affidavit
- ☒ Judgment-Attorney Fees
- ☐ Judgment-Confessed
- ☐ Judgment-Consent
- ☒ Judgment-Declaratory
- ☒ Judgment-Default
- ☒ Judgment-Interest
- ☐ Judgment-Summary
- ☐ Liability
- ☐ Oral Examination
- ☐ Order
- ☐ Ownership of Property
- ☐ Partition of Property
- ☐ Peace Order
- ☐ Possession
- ☐ Production of Records
- ☐ Quarantine/Isolation Order
- ☐ Reinstatement of Employment
- ☐ Return of Property
- ☐ Sale of Property
- ☐ Specific Performance
- ☐ Writ-Error Coram Nobis
- ☐ Writ-Execution
- ☐ Writ-Garnish Property
- ☐ Writ-Garnish Wages
- ☐ Writ-Habeas Corpus
- ☐ Writ-Mandamus
- ☐ Writ-Possession

*If you indicated* ***Liability*** *above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded. ☐ Liability is not conceded, but is not seriously in dispute. ☒ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000 ☐ $10,000 - $30,000 ☐ $30,000 - $100,000 ☒ Over $100,000

☐ Medical Bills $________ ☐ Wage Loss $________ ☐ Property Damages $________

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation ☒ Yes ☐ No
B. Arbitration ☐ Yes ☒ No
C. Settlement Conference ☒ Yes ☐ No
D. Neutral Evaluation ☐ Yes ☒ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated* ***LENGTH OF TRIAL.***

***(Case will be tracked accordingly)***

☐ 1/2 day of trial or less
☐ 1 day of trial time
☐ 2 days of trial time
☐ 3 days of trial time
☐ More than 3 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

***For all jurisdictions,*** *if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited** - Trial within 7 months of Defendant's response

☐ **Standard** - Trial within 18 months of Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response

☐ **Standard** - Trial within 18 months of Defendant's response

***IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.***

## CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☐ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff ______________. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

## CIRCUIT COURT FOR BALTIMORE COUNTY

| | |
|---|---|
| ☐ Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☒ Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

7/21/26
Date

Angel E. Reyes (signature) 2507211007
Signature of Attorney/Party — Attorney Number

1601 Connecticut Ave NW, Suite 800
Street Address

Angel Reyes
Printed Name

Washington — D.C. — 20009
City — State — Zip Code

angel@powertothepeoplelaw.com
E-mail



Reset